Oral argument not yet scheduled

No. 21-3722

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

Scott Creech,

Plaintiff-Appellant,

v.

Ohio Department of Rehabilitation and Correction,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Ohio
Case No. 2:19-cv-104 (Graham, J.)

**OPENING BRIEF FOR PLAINTIFF-APPELLANT
SCOTT CREECH**

| | |
|---|---|
| Oren Nimni | Hannah Mullen |
| Samuel Weiss | Brian Wolfman |
| RIGHTS BEHIND BARS | Madeline Meth |
| 416 Florida Ave., NW #26152 | GEORGETOWN LAW |
| Washington, D.C. 20001 | APPELLATE COURTS |
| | IMMERSION CLINIC |
| Kyle Deakins | 600 New Jersey Ave., |
| Wynne Leahy | NW, Suite 312 |
| Pegah Nabili | Washington, D.C. |
| Student Counsel | 20001 |
| | (202) 661-6582 |
| December 10, 2021 | |

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 21-3722      Case Name: Creech v. Ohio Dept of Rehabilitation

Name of counsel: Hannah Mullen

Pursuant to 6th Cir. R. 26.1, Scott Creech

*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

    No.

## CERTIFICATE OF SERVICE

I certify that on _____ December 10, 2021 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Hannah Mullen

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................iii

INTRODUCTION ...............................................................................1

REQUEST FOR ORAL ARGUMENT...................................................3

STATEMENT OF JURISDICTION ......................................................3

STATEMENT OF THE ISSUES ...........................................................3

STATEMENT OF THE CASE...............................................................4

    I.    Factual background ................................................................4

    II.   Procedural background ..........................................................8

SUMMARY OF THE ARGUMENT....................................................12

STANDARD OF REVIEW .................................................................14

ARGUMENT.....................................................................................14

    I.    The Department violated Title II of the ADA when it denied Mr. Creech a reasonable accommodation for his disability. .....................14

        A.   Mr. Creech is disabled because his injuries and pain substantially limit his ability to walk and stand. ...................................................16

        B.   Mr. Creech was otherwise qualified to take part in the prison's services, programs, or activities. .......................................................17

        C.   The Department's confiscation of Mr. Creech's cane denied him meaningful access to prison services, programs, or activities by reason of his disability. ......................................................................18

        D.   Mr. Creech's proposed accommodation—continued use of his cane—was objectively reasonable, and the Department has not carried its burden to show otherwise................................................20

    II.   The Eleventh Amendment does not shield the Department from Mr. Creech's Title II claim.................................................................23

        A.   The relevant context for the Eleventh Amendment inquiry is Title II violations that implicate prison administration..........................25

B.   Congress identified the constitutional rights that it sought to enforce when it enacted Title II. ..........................................................27

C.   Congress identified a history and pattern of state violations of the constitutional rights of people with disabilities. .............................29

D.   Congress's abrogation of Eleventh Amendment immunity is congruent and proportional to the pattern of constitutional violations against prisoners with disabilities. ..................................30

   1.   Before enacting the ADA, Congress spent decades unsuccessfully attempting to address state abuses of inmates with disabilities. ...........................................................32

   2.   The ADA addressed the persistent abuse of individuals with disabilities in state prisons that prior legislation failed to remedy. ......................................................................36

   3.   Court decisions contained myriad examples of prisons violating the constitutional rights of inmates with disabilities. ......................................................................39

   4.   Title II is well-tailored to the history of constitutional violations inflicted on inmates with disabilities. ..................43

CONCLUSION ......................................................................................45

CERTIFICATE OF COMPLIANCE .........................................................

DESIGNATION OF RELEVANT DOCUMENTS ................................................

CERTIFICATE OF SERVICE ....................................................................

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Ability Ctr. of Greater Toledo v. City of Sandusky,*
    385 F.3d 901 (6th Cir. 2004)......................................................15, 20

*Anderson v. City of Blue Ash,*
    798 F.3d 338 (6th Cir. 2015)..............................................19, 20, 22

*Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.,*
    405 F.3d 954 (11th Cir. 2005).........................................................30

*Bd. of Trs. of Ala. v. Garrett,*
    531 U.S. 356 (2001)...................................................23, 24, 37, 38

*Bounds v. Smith,*
    430 U.S. 817 (1977)........................................................................28

*City of Boerne v. Flores,*
    521 U.S. 507 (1997).............................................................24, 25, 30

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
    473 U.S. 432 (1985)........................................................................42

*Constantine v. Rectors & Visitors of George Mason Univ.,*
    411 F.3d 474 (4th Cir. 2005).........................................................30

*Cortes-Quinones v. Jimenez-Nettleship,*
    842 F.2d 556 (1st Cir. 1988) .........................................................41

*Cummings v. Roberts,*
    628 F.2d 1065 (8th Cir. 1980).......................................................40

*Dare v. California,*
    191 F.3d 1167 (9th Cir. 1999).......................................................29

*Doe v. Salvation Army in U.S.*,
    531 F.3d 355 (6th Cir. 2008) ........................................................................16

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ......................................................................................14

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ......................................................................................28

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ...............................................................................18, 28

*Fisher v. Nissan N. Am., Inc.*,
    951 F.3d 409 (6th Cir. 2020) ................................................................14, 19

*Guttman v. Khalsa*,
    669 F.3d 1101 (10th Cir. 2012) ............................................................30, 31

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ....................................................................................39

*Jaros v. Ill. Dep't of Corr.*,
    684 F.3d 667 (7th Cir. 2012) ......................................................................18

*Johnson v. City of Saline*,
    151 F.3d 564 (6th Cir. 1998) ......................................................................17

*Keller v. Chippewa Cnty., Mich. Bd. of Comm'rs*,
    860 F. App'x 381 (6th Cir. 2021) ..............................................15, 18, 19, 20

*Kimel v. Fla. Bd. of Regents*,
    528 U.S. 62 (2000) ....................................................................24, 25, 27, 31

*Klingler v. Dir., Dep't of Revenue*,
    455 F.3d 888 (8th Cir. 2006) ......................................................................30

*LaFaut v. Smith*,
    834 F.2d 389 (4th Cir. 1987) ......................................................................40

*Leach v. Shelby Cnty. Sheriff,*
    891 F.2d 1241 (6th Cir. 1989)................................................................41

*Lewis v. Casey,*
    518 U.S. 343 (1996)...........................................................................18

*Littlefield v. Deland,*
    641 F.2d 729 (10th Cir. 1981)............................................................41

*Maclin v. Freake,*
    650 F.2d 885 (7th Cir. 1981)..............................................................41

*Miranda v. Munoz,*
    770 F.2d 255 (1st Cir. 1985) ..............................................................40

*Monette v. Elec. Data Sys. Corp.,*
    90 F.3d 1173 (6th Cir. 1996)..............................................................21

*Morrissey v. Laurel Health Care Co.,*
    946 F.3d 292 (6th Cir. 2019)..............................................................16

*Nev. Dep't of Hum. Res. v. Hibbs,*
    538 U.S. 721 (2003).....................................................................26, 27

*Pa. Dep't of Corr. v. Yeskey,*
    524 U.S. 206 (1998)...........................................................................15

*Parrish v. Johnson,*
    800 F.2d 600 (6th Cir. 1986).........................................................41, 42

*Phiffer v. Columbia River Corr. Inst.,*
    384 F.3d 791 (9th Cir. 2004)..............................................................29

*Ramos v. Lamm,*
    639 F.2d 559 (10th Cir. 1980)............................................................40

*Sandin v. Conner,*
    515 U.S 472 (1995)............................................................................28

*Tennessee v. Lane*,
    541 U.S. 509 (2004)........................ 23, 24, 25, 26, 27, 28, 29, 30, 31, 39, 43, 44

*Toledo v. Sanchez*,
    454 F.3d 24 (1st Cir. 2006) .................................................................30

*United States v. Georgia*,
    546 U.S. 151 (2006)........................................................17, 24, 28, 39

*Wilson v. Gregory*,
    3 F.4th 844 (6th Cir. 2021)........................................................15, 19

*Wright v. N.Y. State Dep't of Corr.*,
    831 F.3d 64 (2d Cir. 2016) ........................................................17, 18

*Zibbell v. Mich. Dep't of Hum. Servs.*,
    313 F. App'x 843 (6th Cir. 2009) ..................................................12

## Statutes and regulations

18 U.S.C. § 3626 ..................................................................................43

18 U.S.C. § 3626(a)(1)(A) ..................................................................43

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1915(a) ...............................................................................9

28 U.S.C. § 1915(e)(2)(B)(i) ...............................................................43

28 U.S.C. § 1915(g) .............................................................................43

29 U.S.C. § 794(a) ...............................................................................33

29 U.S.C. §§ 2601-2654 .....................................................................26

42 U.S.C. § 1997 ..................................................................................34

42 U.S.C. § 1997a ............................................................................. 35

42 U.S.C. § 1997b(a)(2) .................................................................. 35

42 U.S.C. § 1997e(a) ....................................................................... 43

42 U.S.C. § 12101(a)(3) .................................................................. 37

42 U.S.C. § 12101(b)(1) .................................................................. 14

42 U.S.C. § 12102(1)(A) ................................................................. 16

42 U.S.C. § 12102(2)(A) ................................................................. 16

42 U.S.C. § 12102(4)(A) ................................................................. 16

42 U.S.C. § 12102(4)(D) ................................................................. 22

42 U.S.C. § 12102(4)(E)(i) .............................................................. 22

42 U.S.C. § 12102(4)(E)(ii) ............................................................. 22

42 U.S.C. § 12131(2) ....................................................................... 17

42 U.S.C. § 12132 ........................................................... 9, 14, 19, 43

42 U.S.C. § 12202 ............................................................................ 24

28 C.F.R. § 35.130(b)(7) ................................................................. 15

28 C.F.R. § 35.101(b) ..................................................................... 16

28 C.F.R. § 35.150(a) ...................................................................... 43

## Legislative materials

154 Cong. Rec. 17,741 (2008) ....................................................... 22

*Civil Rights for Institutionalized Persons: Hearings Before the
Subcomm. on Cts., C.L., & the Admin. of Just. of the H. Comm. on
the Judiciary*, 95th Cong. (1977) .................................................. 34

*Civil Rights of Institutionalized Persons: Hearings on H.R. 10 Before the Subcomm. on Cts., C.L., & the Admin. of Just. of the H. Comm. on the Judiciary*, 96th Cong. (1979) ....................................36

*Civil Rights of Institutionalized Persons: Hearing on S. 1393 Before the S. Subcomm. on the Const. of the S. Comm. on the Judiciary*, 95th Cong. (1977).................................................................35

*Civil Rights of Institutionalized Persons: Hearings on S. 1393 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 95th Cong. (1978).................................................................34

*Corrections, Part VIII, Prisons, Prison Reform, and Prisoners' Rights: Michigan: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 92d Cong. (1972) .................................32, 33

H.R. Rep. No. 95-1058 (1978) .................................................32

H.R. Rep No 101-485 (1990) .............................................37, 38

*Joint Hearing on H.R. 2273, The Americans with Disabilities Act of 1989: Before Subcomm. on Select Educ. and Emp. Opps. of the H. Comm. on Educ. and Labor*, 101st Cong. (1989)..............................37

*Part VIII, Prisons, Prison Reform, and Prisoners' Rights: Michigan: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 92d Cong. (1972) .............................................32

*Oversight Hearing on H.R. 4498, Americans with Disabilities Act of 1988: Before Subcomm. on Select Educ. of the H. Comm. on Educ. and Labor*, 100th Cong. (1988) .........................................37

S. Rep. No. 92-1135 (1972).....................................................33

S. Rep. No. 101-116 (1989).....................................................38

**Other Authority**

Charles R. Richey, Manual on Employment Discrimination § 6.5
Inmates (2021)...................................................................................18

Fed. R. App. P. 4(c)................................................................................3

Office of Juvenile Justice and Delinquency Prevention, U.S.
Dep't of Justice, Beyond the Walls: Improving Conditions of
Confinement for Youth in Custody (1998)...................................35

U.S. Comm'n on C.R., Accommodating the Spectrum of
Individual Abilities (1983) .......................................................35, 38

## INTRODUCTION

Scott Creech suffered brain hemorrhaging, compression fractures in his neck and back, broken ribs, and a torn ACL when he was injured in a severe motorcycle accident. The long-term effects of the crash make it difficult for Mr. Creech to stand and walk. But with a cane, he can get around well enough. Mr. Creech is currently incarcerated in an Ohio state prison, where he used his cane for nearly eight years without incident and with great benefit. With his cane, he was able to walk laps around the yard to keep healthy. Then a nurse practitioner determined that Mr. Creech's cane was no longer "medically indicated" and confiscated it for three years.

In the first year without his cane, Mr. Creech tried to stay active and continue walking outside every day. But he struggled to get around safely and sometimes became nearly immobilized by his pain. After several close calls, where Mr. Creech could barely hobble back inside to avoid missing the prison count, he stopped trying to go outside. Mr. Creech repeatedly fell because he was unable to maintain his balance without his cane. It also became difficult for him to access the cafeteria and prison law library, and he could no longer join other inmates on the bleachers to watch sports games in the yard. Unable to move and exercise, Mr. Creech gained weight and his body stiffened, exacerbating his pain.

1

The Ohio Department of Rehabilitation and Correction violated Title II of the Americans with Disabilities Act by failing to accommodate Mr. Creech's disability when it took away his cane. The ADA requires public entities, including prisons, to provide reasonable accommodations to individuals with disabilities who are otherwise qualified to enjoy the entity's services, programs, or activities, yet are excluded from those activities by reason of their disability. Mr. Creech meets those criteria.

Nor does the Eleventh Amendment shield the Department from liability. Congress may abrogate states' immunity from suit when it validly exercises its power under the Fourteenth Amendment to enact prophylactic legislation to protect constitutional rights. No one disputes that Congress intended to abrogate the states' Eleventh Amendment immunity when it passed Title II of the ADA, and Title II is well-tailored to the constitutional harms against people with disabilities that Congress sought to remedy. In enacting Title II and earlier legislation to protect prisoners with disabilities, Congress assembled a voluminous record documenting countless state violations of the constitutional rights of inmates with disabilities. Still, Title II requires states to take only certain actions to comply with its mandates. The Department is not free to neglect and mistreat inmates with disabilities up to the line of unconstitutionality, as Congress has reasonably prohibited that behavior to prevent actual constitutional violations.

2

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant Scott Creech requests oral argument. Argument would aid the Court in evaluating his claim under the Americans with Disabilities Act and the important question whether Congress validly abrogated the states' Eleventh Amendment immunity in Title II of the ADA.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. The district court's June 30, 2021 Decision and Order granted the Department's motion for summary judgment, disposing of all claims of all parties. (RE 94, Decision and Order, PageID 1126.) The district court issued a separate judgment on the same date, dismissing the action with prejudice. (RE 95, Judgment, PageID 1127.) Plaintiff-Appellant Scott Creech timely filed a notice of appeal on July 30, 2021, which was docketed on August 6, 2021. (RE 98, Notice of Appeal, PageID 1141.) *See* Fed. R. App. P. 4(c). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.** Title II of the Americans with Disabilities Act prohibits discrimination against individuals with disabilities in the provision of public services and, accordingly, requires public entities to make reasonable accommodations for individuals with disabilities. After the Department took away Mr. Creech's

cane for three years, Mr. Creech struggled to access basic prison services including the cafeteria, yard, and law library.

The first issue is whether the Department violated Title II of the ADA when it took away Mr. Creech's cane.

**II.** Under Section 5 of the Fourteenth Amendment, Congress may abrogate states' Eleventh Amendment immunity, thus exposing them to suits. An abrogation is valid if it is congruent and proportional to a pattern of underlying constitutional violations.

The second issue is whether Congress validly abrogated the states' immunity from suits about prison administration when it enacted Title II of the ADA.

## STATEMENT OF THE CASE

### I. Factual background

In August 1999, Plaintiff-Appellant Scott Creech was seriously injured in a motorcycle accident. (RE 17, Amended Complaint, PageID 98.) He was airlifted to a hospital, where he remained for almost a month as he recovered from brain hemorrhaging, compression fractures in his neck and back, broken ribs, damaged lungs, and a torn ACL. (RE 66, Creech Deposition, PageID 465-66.) The accident left him with permanent brain and musculoskeletal injuries, double vision, and poor balance. (RE 65, Mot. for Summ. J., PageID 319; RE 73, Def's Opp. and Cross-Mot. for Summ. J.,

PageID 810.) Today, Mr. Creech has difficulty standing and walking and suffers from severe pain in his hip and leg. (RE 17 PageID 98-100.)

To help him get around, Mr. Creech's physician prescribed him a cane. (RE 17 PageID 99; RE 66 PageID 488-89.) But when he entered the Ohio prison system in 2008, Defendant-Appellee Ohio Department of Rehabilitation and Correction confiscated his cane. (RE 17 PageID 99.) After Mr. Creech repeatedly inquired about a mobility aid, multiple medical providers at Chillicothe Correctional Institution "determined that Creech required a cane … to aid[] in mobility purposes" and returned it to him. (*Id.*) Mr. Creech later saw an orthopedic surgeon at Ohio's Correctional Medical Center who granted him medical access to a bottom bunk bed and advised him to continue using his cane as needed. (RE 66 PageID 498-99.)

With his cane, Mr. Creech walked outside every day to maintain his health. (RE 65 PageID 404; RE 66 PageID 507.) Others in the prison knew that Mr. Creech was dedicated to being healthy. He even signed an agreement with the prison warden that he would walk two miles every day. (RE 66 PageID 507.) Some days, he was able to walk up to five miles. (*Id.*) Mr. Creech took these walks with a group of fellow inmates, who remember that he could be "hard to keep up with" when he was "in cane drive." (RE 65 PageID 405.) Exercising, Mr. Creech says, lets him manage his long-term injuries by

"help[ing] me sleep at night. It gets my natural pain killers going. It keeps me healthy." (RE 66 PageID 508.)

Mr. Creech used his cane for years without incident. (*See* RE 65 PageID 330-35.) Then, in August 2016, a prison nurse practitioner overrode Mr. Creech's medical accommodation and discontinued any further access to his cane. (RE 17 PageID 99; RE 66 PageID 500-01.) Contemporaneous medical records state that Mr. Creech's cane was "not medically indicated based upon mobility" and that Mr. Creech walked with a "swift gate using [a] cane." (RE 73 PageID 863-66.) Later, in an affidavit attached to the Department's summary-judgment motion, the nurse practitioner stated that his determination was based on a review of Mr. Creech's medical file and the nurse practitioner's personal observations of Mr. Creech "during a clinic evaluation" and "walking in the yard and through the hallways." (RE 73 PageID 842.) The nurse practitioner also generally cited "institutional safety concerns regarding the use of a cane," even though Mr. Creech had never used his cane improperly. (*Id.*) Mr. Creech requested that his cane to be returned to him, but the Department refused. (RE 17 PageID 105-06.)

Without his cane, Mr. Creech's health rapidly deteriorated. (RE 65 PageID 401-02.) In the first year after his cane was taken away from him, Mr. Creech continued to try to walk outside every day. (RE 66 PageID 509-10.) But after "a couple of bad spells where [he would] almost miss getting back to the

dorm for count … because [he] was aching so bad [he] couldn't hardly walk," Mr. Creech "slowly just quit going out there." (*Id*.) Without exercise, Mr. Creech's pain and underlying medical conditions worsened. (RE 65 PageID 401-02.) Mr. Creech fell on several different occasions when struck with bouts of extreme pain or when he slipped because, without a cane, he could not maintain his balance. (RE 17 PageID 100; RE 65 PageID 409; RE 66 PageID 504-05.)

The severe pain left Mr. Creech unable to participate in day-to-day prison life and activities with his fellow inmates, many of whom used canes. (*See* RE 17 PageID 100; RE 65 PageID 402.) At times, Mr. Creech could not walk any distance beyond his unit without falling and had to hold onto walls or beds to maintain his balance, even while in his unit. (RE 17 PageID 99; RE 66 PageID 504.) Mr. Creech often could not walk to the cafeteria and instead had to rely on other inmates to carry food from the commissary back to his cell. (RE 17 PageID 100; RE 66 PageID 512-13.)

Mr. Creech also found it hard to make the three-quarter-mile walk to the prison law library, which limited his library access. (RE 17 PageID 100; RE 65 PageID 402; RE 66 PageID 577-78.) He similarly struggled to get to the gym to exercise during the winter because of the distance he had to walk without support. (RE 17 PageID 100; RE 65 PageID 402; RE 66 PageID 579-80.) Before his cane was taken, Mr. Creech enjoyed watching softball,

7

pickleball, and horseshoes in the prison yard. (RE 66 PageID 575-77.) But without his cane, Mr. Creech was unable to climb the bleachers to see the games, and "[s]tanding up around the fence for a long period of time [was] just out of the question" because of the pain. (*Id.* at 575-76.)

On his worst days, Mr. Creech was unable to leave his cell. (*See* RE 66 PageID 523-24.) Bedridden, Mr. Creech relied on other inmates to heat up wet towels and place them on his back to help with his pain. (*Id.*) Other times, Mr. Creech could not leave the dorm and would stand only to heat up food or use the restroom. (*Id.* PageID 503, 524.) "Sometimes [Mr. Creech would] not come back out for days." (RE 65 PageID 405.) He gained weight and otherwise physically deteriorated to the point that "if [he] stand[s] still for ten minutes ... it feels like [his] back is going to snap." (*Id.* PageID 406; RE 66 PageID 522.)

Mr. Creech's cane was eventually returned to him, three years after it was taken away, following a consultation with the prison's then-new Chief Medical Officer. (RE 73 PageID 840.) Mr. Creech "immediately started to try to walk … on a daily basis" and his health is not "getting any worse." (RE 65 PageID 406.) But "[t]he damage is done." (RE 66 PageID 529.)

## II. Procedural background

After Mr. Creech's cane was taken away, he asked for it back from the prison's chief medical inspector, who had the authority to overturn the nurse

8

practitioner's determination. (RE 17 PageID 105.) After his grievance and appeals were rejected, Mr. Creech sued the Ohio Department of Rehabilitation and Correction under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, in the Southern District of Ohio. (*Id.* PageID 94.) It was only after Mr. Creech filed suit that his cane was returned to him. (RE 73 PageID 813.) Mr. Creech claimed that the Department violated the ADA in failing to accommodate his disability by taking away his cane. (RE 17 PageID 99-100.) He sought both money damages and the guaranteed return of his cane. (*Id.* PageID 102.)

After the suit passed screening under the Prison Litigation Reform Act, 28 U.S.C. § 1915(a) (RE 18, Order, PageID 111), the parties cross-moved for summary judgment. (RE 65 PageID 303; RE 73 PageID 801.) The Department argued that Mr. Creech was not a "qualified individual with a disability" under the ADA and had not shown that the Department had discriminated against him based on his disability. (RE 73 PageID 815-18, 832-35). The Department also claimed that it is entitled to Eleventh Amendment immunity. (*Id.* PageID 821-32.)

In his initial Report and Recommendations, the magistrate judge recommended granting the Department's cross-motion for summary judgment. (RE 82, Magistrate Judge's Report and Recommendations, PageID 1019.) On Mr. Creech's ADA claim, the magistrate judge determined that Mr.

9

Creech was a "qualified individual with a disability," explaining that the Department had "effectively conceded" that Mr. Creech needed his cane, and that his disability interferes with activities such as walking and eating, which undoubtedly qualify as "major life functions." (RE 82 PageID 1014.) The magistrate judge stated, however, that Mr. Creech's Title II claim failed because he did not offer evidence that the nurse practitioner's determination to remove his cane was not made in good faith. "[E]ven if [the Department] were not immune from damages under the ADA," "Creech's claim [under Title II] would be without merit" because the nurse practitioner exercised his medical judgment in taking away Mr. Creech's cane. (*Id.* PageID 1018-19.)

Regarding Eleventh Amendment immunity, the magistrate judge stated that "Creech has not pleaded conduct by [the Department] which infringes on rights protected by the Fourteenth Amendment." (RE 82 PageID 1017.) He concluded that Mr. Creech had sufficient access to the prison law library because he was able to litigate a separate habeas corpus case in the district court and "[t]he Constitution does not require that prisoner access to a law library be painless." (*Id.*) The magistrate judge also stated that because walking and eating are "major life functions the Supreme Court has not held to be protected by the Fourteenth Amendment," protecting such activities

10

under Title II "is beyond the Congressional authority conferred by § 5 of the Fourteenth Amendment." (*Id.*)

Mr. Creech objected to the initial Report and Recommendations. (RE 85, Pltf's Obj. to Rep. and Recs., PageID 1033). Mr. Creech maintained that the magistrate judge had not adequately considered the evidence he provided, and he challenged the magistrate judge's conclusions on the elements of the Title II claim and on the Eleventh Amendment issue. (*Id.* PageID 1033-44.)

The district court sent the case back to the magistrate judge for reconsideration in light of Mr. Creech's objections. (RE 86, D. Ct's Recommittal Order, PageID 1045.) The magistrate judge then concluded that summary judgment should be granted to the Department on Mr. Creech's Title II claim because Mr. Creech did not show that his requested accommodation—being allowed to use his cane—was reasonable. (RE 88, Magistrate Judge's Supp. Rep. and Recs., PageID 1063-64.) The magistrate judge also reiterated that Title II did not validly abrogate Eleventh Amendment immunity as to Mr. Creech's claim because he "had not shown any deprivation of a constitutional right protected by the Fourteenth Amendment." (*Id.* PageID 1066.) The magistrate judge maintained that, under current law, abrogation is valid only if the plaintiff "is seeking ADA protection for engaging in activities expressly protected by the Fourteenth Amendment." (*Id.* PageID 1065.)

11

The district court adopted the magistrate judge's Report and Recommendations over Mr. Creech's objections and granted the Department's motion for summary judgment on Mr. Creech's Title II claim. (RE 94 PageID 1122-26.) Despite resolving the case by holding that Mr. Creech was not entitled to an accommodation under the ADA, the district court then went on to hold that the Eleventh Amendment rendered the Department immune. (*Id.*); *see Zibbell v. Mich. Dep't of Hum. Servs.*, 313 F. App'x 843, 850 (6th Cir. 2009) (vacating ruling on immunity question in identical procedural circumstances).

## SUMMARY OF THE ARGUMENT

**I**. Title II of the ADA requires a public entity to provide reasonable accommodations to ensure that qualified individuals with disabilities can access the entity's services, programs, or activities. Without his cane, Mr. Creech struggled to walk to the prison yard, law library, and cafeteria. His pain worsened and his physical fitness deteriorated. Mr. Creech is a person with a disability under the ADA, and the Department discriminated against him because of his disability in violation of Title II when it took away his cane, thereby denying him the reasonable accommodation he needed to access the prison's services.

**II**. The Eleventh Amendment does not shield the Department from Mr. Creech's claim for damages under Title II. Congress can validly abrogate the

states' Eleventh Amendment immunity when it exercises its power under Section 5 of the Fourteenth Amendment to enact appropriate prophylactic legislation to address constitutional violations. Congress did so here, in the context of Title II violations that implicate prison conditions: Congress explicitly stated its intent to abrogate Eleventh Amendment immunity, sought to protect individuals with disabilities against unconstitutional discrimination, and compiled an extensive record of that discrimination.

Most importantly, Title II's abrogation was congruent and proportional to the underlying pattern of unconstitutional disability discrimination in prisons. Prior to the ADA's enactment, Congress reviewed ample evidence of unconstitutional disability discrimination against prisoners and attempted to ameliorate those constitutional violations through incremental legislation. Dissatisfied with those efforts, Congress enacted Title II of the ADA to address the intractable problem of neglect and abuse of inmates with disabilities. Moreover, Title II regulates a circumscribed set of government actions and is reasonably tailored to the violations of the constitutional rights of prisoners with disabilities that Congress identified. As applied to the context of prison administration, Title II is thus a congruent and proportional response to disability discrimination.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo, "viewing all the evidence in the light most favorable to the nonmoving party and drawing 'all justifiable inferences' in his favor." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Pro se filings are "to be liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## ARGUMENT

### I.  The Department violated Title II of the ADA when it denied Mr. Creech a reasonable accommodation for his disability.

Congress passed the Americans with Disabilities Act "to provide a clear and comprehensive national mandate" establishing broad civil-rights protections for individuals with disabilities in employment, public services, public accommodations, health services, and institutionalization. 42 U.S.C. § 12101(b)(1).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To satisfy this statutory mandate, public entities must furnish reasonable

14

accommodations to individuals with disabilities "so as not to deprive them of meaningful access to the benefits of the services such entities provide." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004); *see Wilson v. Gregory*, 3 F.4th 844, 859 (6th Cir. 2021). The requirement to reasonably accommodate individuals with disabilities "unambiguously extends to state prison inmates." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998).

As relevant here, the Department illegally discriminated against Mr. Creech in violation of Title II because (1) he is disabled, (2) he is otherwise qualified to take part in the prison's "services, programs, or activities," (3) he was excluded from participation in those activities "by reason of" his disability and (4) the Department denied Mr. Creech a "reasonable" accommodation. 28 C.F.R. § 35.130(b)(7); *see Keller v. Chippewa Cnty., Mich. Bd. of Comm'rs*, 860 F. App'x 381, 385-86 (6th Cir. 2021). As we now show, Mr. Creech fits the statutory criteria for an accommodation and has proposed a reasonable option: provision of a cane. The Department unlawfully denied him that accommodation and has failed to show that providing Mr. Creech a cane would create an undue hardship.

15

### A. Mr. Creech has a disability because his injuries and pain substantially limit his ability to walk and stand.

The ADA defines "disability" as a "physical … impairment that substantially limits one or more major life activities of [an] individual" including "walking, standing, [and] lifting." 42 U.S.C. § 12102(1)(A), (2)(A); *see Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019). This definition is to be "construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.101(b); *see* 42 U.S.C. § 12102(4)(A). Mr. Creech's permanent physical injuries affect him "all the time" (RE 66 PageID 509) and significantly limit his ability to walk and stand. (RE 17 PageID 98-99; RE 66 PageID 503, 510, 580). Without his cane, Mr. Creech sometimes required support to walk even within his unit and was often unable to walk outside of his unit without falling. (RE 17 PageID 99; RE 66 PageID 503-04, 580.) He was sometimes bedridden because he was in too much pain to stand. (RE 66 PageID 503.)

"Courts are required to make a case by case determination of whether an individual qualifies as 'disabled'" using the criteria set forth by Congress. *Doe v. Salvation Army in U.S.*, 531 F.3d 355, 358 (6th Cir. 2008) (analyzing the definition of disability later incorporated into the ADA's 2008 amendments). Thus, the parties' focus below on the findings of the Social Security Administration (RE 73 PageID 833) and the Department's nurse practitioner

16

(*id.* PageID 829-30, 835) was misplaced; those determinations are not relevant to the Title II inquiry. Because his injuries substantially limit his ability to walk and stand, Mr. Creech has a disability under the ADA.

## B. Mr. Creech was otherwise qualified to take part in the prison's services, programs, or activities.

A prisoner with a disability is qualified to participate in prison programs, services, or activities if he, "with or without reasonable modifications to rules, policies, or practices … or the provision of auxiliary aids and services, meets the essential eligibility requirements for … participation" in those programs, services, or activities. 42 U.S.C. § 12131(2). "'Services, programs, or activities' encompasses virtually everything that a public entity does," *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998), including, in the prison context, a prisoner's daily recreational, medical, educational, and vocational activities, *United States v. Georgia*, 546 U.S. 151, 157 (2006) (citing *Yeskey*, 524 U.S. at 210).

As a prisoner who was not restricted from using prison programs, Mr. Creech was "qualified" for them. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). Before his cane was taken, Mr. Creech took walks on the prison track and observed sports in the prison yard. (RE 65 PageID 404-05; RE 66 PageID 507, 575-76.) And—like all inmates—Mr. Creech is qualified to receive the prison's meals and to access the prison law library

17

(both of which the Constitution otherwise demands). *See Lewis v. Casey*, 518 U.S. 343, 351 (1996); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Department does not and could not contend otherwise. Indeed, the Department acknowledges that "the [] able-bodied inmates were" accessing the available prison "programs, services, or activities" by "go[ing] out on the yard, go[ing] to the chow hall, [and] visit[ing] the law library." (RE 73 PageID 817-18).

## C. The Department's confiscation of Mr. Creech's cane excluded him from meaningful access to prison services, programs, or activities "by reason of" his disability.

An inmate with a disability is excluded from the prison's services, programs, or activities when, "as a practical matter," he is "denied 'meaningful access'" to them. *Wright*, 831 F.3d at 72; *see Keller*, 860 F. App'x at 386. Denial of "meaningful access" includes restricting a prisoner's ability to otherwise "move freely throughout" a prison, "discourag[ing] participation in prison activities," causing a prisoner to "at times [be] unable to visit the law library," "missing meals," and "avoid[ing] recreational time in the prison yard." *Wright*, 831 F.3d at 73; *see Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012); *Keller*, 860 F. App'x at 386; 1 Charles R. Richey, Manual on Employment Discrimination § 6:5 Inmates (2021).

18

After the Department took away his cane, Mr. Creech struggled to participate in the daily life of the prison. Once an avid walker, Mr. Creech stopped walking as much and effectively stopped using his recreational time because of the pain he felt trying to walk without his cane. (RE 66 PageID 509-10.) The pain and risk of a damaging fall also discouraged Mr. Creech from visiting the law library and eating meals in the cafeteria. (RE 17 PageID 100; RE 66 PageID 538-39, 575.) These limitations followed directly from, or to use the statute's words, "by reason of," Mr. Creech's disability. 42 U.S.C. § 12132.

Unable to deny that Mr. Creech lacked meaningful access to the cafeteria, law library, and other prison services without his cane, the Department argued below that a plaintiff bringing a failure-to-accommodate claim must show intentional discrimination by prison officials. (RE 73 PageID 832-35.) Not so. "Two types of claims are cognizable under Title II: claims for intentional discrimination *and claims for a reasonable accommodation.*" *Wilson*, 3 F.4th at 859 (quoting *Roell v. Hamilton Cnty.*, 870 F.3d 471, 488 (6th Cir. 2017)) (emphasis added). As this Court has explained, a public entity's refusal to provide a reasonable accommodation is itself disability discrimination, whether or not the entity harbors animus against the individual with a disability. *See Keller*, 860 F. App'x at 385; *Anderson v. City*

*of Blue Ash*, 798 F.3d 338, 353-56 (6th Cir. 2015)); *cf. Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020).

The Department also argued that because Mr. Creech "was still able to" participate in programs and activities to a limited extent, Mr. Creech was not excluded from participation. (RE 73 PageID 817-18.) That is flatly wrong. "[T]he simple fact that he successfully used them does not necessarily mean that [Mr. Creech] had meaningful access." *Keller*, 860 F. App'x at 387. Requiring a prisoner to endure "an excessive or painful effort" to access prison services can be a denial of meaningful access. *Id.* The Department may not avoid liability because Mr. Creech was sometimes able to endure great pain when moving around the prison without his cane.

### D. Mr. Creech's proposed accommodation—continued use of his cane—was objectively reasonable, and the Department has not shown otherwise.

Title II requires public entities to reasonably accommodate individuals with disabilities to guarantee meaningful access to services, programs, and activities. *Ability Ctr. of Greater Toledo*, 385 F.3d at 909-10. Determining whether an accommodation is reasonable requires a case-by-case, fact-specific inquiry. *Anderson*, 798 F.3d at 356. The magistrate judge faulted Mr. Creech for not demonstrating that his requested accommodation was reasonable. (RE 82 PageID 1018.) But a plaintiff need only propose an

20

objectively reasonable accommodation by showing that it is both effective and proportional to its costs. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996).

Mr. Creech's cane was an objectively reasonable accommodation because it posed no financial burden on the Department in 2016 and, as the Department "effectively conceded," the cane was reasonable and effective in helping Mr. Creech walk from 2008 to 2016 and from 2019 onward. (RE 82 PageID 1014). Once Mr. Creech has proposed a reasonable accommodation, the Department bears the burden of showing that the proposed accommodation imposes an undue hardship. *See Monette*, 90 F.3d at 1183-84. The Department offers no explanation why the cane was temporarily unreasonable from 2016 to 2019 beyond the nebulous contention that canes can be dangerous in a prison and the general observations that Mr. Creech was sometimes able to walk around without assistance and could walk with a "swift gait" while using his cane. (RE 73 PageID 832-34; RE 73-2 Page ID 841-42; RE 73-5 PageID 865). These assertions are unsatisfactory.

The Department never suggested that Mr. Creech used his cane inappropriately, nor that some increased risk arose suddenly in 2016 and then abated in 2019. (RE 82 PageID 1018 n.5.) Indeed, Mr. Creech also alleges, and the Department does not contest, that other inmates were permitted to use canes between 2016 and 2019. (RE 17 PageID 100.) The Department does

21

not argue that these other inmates' canes had created a safety risk. And the Department has provided no evidence that Mr. Creech's possession of a cane created a particular risk such that only his cane needed to be taken away.

The Department's observations that Mr. Creech could sometimes walk around without his cane and could walk swiftly when using it run headlong into the ADA, which states that an "episodic" impairment is a disability if it "substantially limit[s] a major life activity when active." 42 U.S.C. § 12102(4)(D); *see Anderson*, 798 F.3d at 354. And the ameliorative effects of an accommodation may not be considered in determining whether an individual requires one. 42 U.S.C. § 12102(4)(E)(i)-(ii). To determine that continued use of an accommodation would be unreasonable because the accommodation is working would be a "supreme absurdity." 154 Cong. Rec. 17,741 (2008) (statement of Sen. Harkin). The Department's lackluster arguments that Mr. Creech's cane was an unreasonable accommodation are too trivial for a reasonable jury to credit. In any event, even if the Department's arguments were sufficiently substantial to create a genuine dispute of material fact as to the reasonableness of Mr. Creech's cane from 2016 to 2019, that would only underscore that the district court erred in granting its motion for summary judgment. *See Anderson*, 798 F.3d at 356.

## II. The Eleventh Amendment does not shield the Department from Mr. Creech's Title II claim.

The Department violated Title II of the ADA by denying Mr. Creech a reasonable accommodation for his disability. According to the Department, Mr. Creech cannot recover for that violation. On the Department's telling, no state can ever be held accountable for refusing to provide a reasonable accommodation to an inmate with a disability unless doing so violates the inmate's constitutional rights. That cannot be right. To nullify Title II's requirements for the class of people most reliant on state-provided services, programs, and activities would contradict both Congress's intent in enacting Title II and the extensive record developed during the ADA's drafting process.

Although states are generally immune from suit in federal court under the Eleventh Amendment, Congress may abrogate a state's immunity by statute if it legislates through a valid exercise of its power under Section 5 of the Fourteenth Amendment. *Tennessee v. Lane*, 541 U.S. 509, 517-18 (2004). Congress's power to enforce the Fourteenth Amendment is broad and "is not limited to mere legislative repetition of [the Supreme Court's] constitutional jurisprudence," *Bd. of Trs. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001), though the magistrate judge mistakenly thought otherwise. (RE 88 PageID 1065.) Rather, Congress may remedy and deter actual or potential

23

violations of constitutional rights by abrogating the states' immunity for violations of federal statutes that go beyond the Fourteenth Amendment's scope. *Garrett*, 531 U.S. at 356, 365 (2001). Congress enjoys "wide latitude" in enacting "prophylactic" legislation and determining whether it is operating within the bounds of its authority. *City of Boerne v. Flores*, 521 U.S. 507, 528 (1997).

When (as here) a plaintiff alleges a violation of a statutory right that is not coextensive with a constitutional right, courts ask "whether Congress's purported abrogation of sovereign immunity" is valid, following a multi-step analysis articulated by the Supreme Court. *United States v. Georgia*, 546 U.S. 151, 159 (2006). First, Congress must have "unequivocally expressed its intent to abrogate [Eleventh Amendment] immunity." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). Title II meets that requirement, which is not disputed here. *See* 42 U.S.C. § 12202; *Lane*, 541 U.S. at 518.

Second, in subjecting the states to suit, Congress must have "acted pursuant to a valid grant of constitutional authority." *Kimel*, 528 U.S. at 73. The Supreme Court has laid out a three-step test for assessing whether an abrogation is valid: (1) Congress must have identified the constitutional right or rights it sought to enforce, (2) Congress must also have identified a history and pattern of state violations of those rights, and (3) the abrogation must be an appropriate response a history and pattern of violations. *Lane*,

24

541 U.S. at 530; *City of Boerne*, 521 U.S. at 520. These steps are designed to help courts determine whether the prophylactic legislation is congruent and proportional to the constitutional harms identified by Congress. *See Kimel*, 528 U.S. at 81-83. We now turn to that analysis.

### A. The relevant context for the Eleventh Amendment inquiry is Title II violations that implicate prison administration.

The *City of Boerne* inquiry is a context-specific analysis that assesses whether Section 5 legislation is an "appropriate response" to a "history and pattern of unequal treatment," *Lane*, 541 U.S. at 530, in a particular "area[] of public life," *id.* at 516. That analysis looks beyond the specific harms suffered by the plaintiff to consider the "class of cases" implicated by the plaintiff's claims. *Id.* at 531.

*Lane*, for example, concerned two people with paraplegia. One plaintiff "alleged that he was compelled to appear to answer a set of criminal charges on the second floor of a county courthouse that had no elevator." *Lane*, 541 U.S. at 513. When he refused to crawl up the stairs or be carried into the courtroom, he "was arrested and jailed for failure to appear." *Id.* at 514. The other plaintiff, a court reporter, alleged that she "lost both work and an opportunity to participate in the judicial process" because she could not access several courthouses. *Id.* The Supreme Court held that Title II validly abrogated Eleventh Amendment immunity in the entire "class of cases

25

implicating the accessibility of judicial services." *Id.* at 531. Despite the specific facts at issue—the plaintiffs' inability to physically enter courthouses on their own because of their particular disability, paraplegia—the Court described the case as generally implicating "the right of access to courts." *Id.* at 523. The Court discussed the variety of constitutional protections for that broad right, including the Sixth Amendment Confrontation Clause right of a criminal defendant to be present at trial, a civil litigant's Due Process Clause right to a "meaningful opportunity to be heard," a criminal defendant's right to be tried by a "jury composed of a fair cross section of the community," and the public's First Amendment right to access criminal proceedings. *Id.*

Similarly, in *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003), the Supreme Court held that the family-leave provisions of the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601-2654, were a valid exercise of Congress's Section 5 power to combat unconstitutional gender discrimination as applied to public entities. *Id.* at 738-39. The plaintiff was a male employee who had applied for family leave to care for an ailing spouse, and his complaint did not claim unconstitutional gender discrimination. *Id.* at 725. But, in analyzing whether the FMLA validly abrogated the states' immunity, the Court looked beyond the specific facts to examine in great detail the broader class of constitutional harms that

Congress sought to address by creating the statute: "gender-based discrimination in the administration of leave benefits." *Id.* at 735.

It makes sense that *Lane* and *Hibbs* looked beyond the plaintiffs' circumstances to analyze the class of cases implicated by their claims. *Lane*, 541 U.S. at 531; *Hibbs*, 538 U.S. at 730-35. Congress is authorized under the Fourteenth Amendment to "remedy and to deter violation[s] of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel*, 528 U.S. at 81. Approaching this case at the same level of generality, the question presented here is whether Title II validly abrogates Eleventh Amendment immunity as applied to disability discrimination in the context of prison administration, to which we now turn.

### B. Congress identified the constitutional rights that it sought to enforce when it enacted Title II.

"The first step of the *Boerne* inquiry requires [a court] to identify the constitutional right or rights that Congress sought to enforce when it enacted Title II." *Lane*, 541 U.S. at 522. In *Lane*, the Supreme Court explained that Title II seeks to eliminate irrational classifications based on disability in violation of the Equal Protection Clause. *Id.* at 522-23. The Court also discussed the "right of access to the courts," as protected by the Due Process Clause, the

Confrontation Clause of the Sixth Amendment, and the First Amendment, "infringements of which are subject to more searching judicial review." *Id.*

Beyond the rights identified in *Lane*, Title II reasonable-accommodation claims also implicate the "constellation of rights applicable in the prison context," including the Eighth Amendment's protections against "inadequate medical care and inhumane conditions of confinement." *Georgia*, 546 U.S. at 162-63 (Stevens, J., concurring). Under the Eighth Amendment, state officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (quotation marks omitted). Officials may not act with deliberate indifference to inmates' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976). Inmates also retain their due-process liberty rights including freedom from restraints that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S 472, 484 (1995), and states have an affirmative obligation to ensure that prisoners retain the fundamental right to access the courts, *Bounds v. Smith*, 430 U.S. 817, 824-25 (1977). This array of constitutional protections forms the basis for Congress's power to enact prophylactic legislation to protect inmates with disabilities from unconstitutional prison conditions.

28

### C. Congress identified a history and pattern of state violations of the constitutional rights of people with disabilities.

The Supreme Court has determined that Title II satisfies the second step of the *Boerne* inquiry: Congress enacted Title II in response to "pervasive unequal treatment of persons with disabilities in the administration of state services and programs, including systematic deprivations of fundamental rights." *Lane*, 541 U.S. at 524. Because Congress documented a "pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system," it is "clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Id.* at 525, 529. "Congress's findings were sufficiently extensive" and the ADA's provisions "can be understood as responsive to or designed to prevent unconstitutional behavior." *Dare v. California*, 191 F.3d 1167, 1175 (9th Cir. 1999) (internal quotations omitted) (citing *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 646 (1999)); *see Phiffer v. Columbia River Corr. Inst.*, 384 F.3d 791, 792-93 (9th Cir. 2004) (reaffirming *Dare*'s holding that Title II validly abrogated states' immunity in a case involving a prisoner's reasonable-accommodation claim). Thus, as most circuits have held, *Lane* conclusively answered the question whether there was sufficient evidence of discrimination to authorize Congress to enact valid prophylactic

29

legislation for the entirety of Title II. *See, e.g.*, *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 485 (4th Cir. 2005); *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005); *Klingler v. Dir., Dep't of Revenue*, 455 F.3d 888, 896 (8th Cir. 2006).

A minority of circuits hold that courts should "focus the entire *City of Boerne* test on the particular category of state conduct at issue." *Toledo v. Sanchez*, 454 F.3d 24, 35 (1st Cir. 2006); *see Guttman v. Khalsa*, 669 F.3d 1101, 1117 (10th Cir. 2012). Even if this Court agrees, Congress developed an extensive record documenting the unconstitutional treatment of inmates by state governments, which, as we now show, is more than sufficient to satisfy the congruence-and-proportionality inquiry.

### D. Congress's abrogation of Eleventh Amendment immunity is congruent and proportional to the pattern of constitutional violations against prisoners with disabilities.

Under the last step of the *Boerne* analysis, this Court must determine whether Congress's abrogation of Eleventh Amendment immunity for Title II claims that address prison administration is "congruent and proportional" to the class of constitutional violations at issue. *Lane*, 541 U.S. at 531; *see City of Boerne*, 521 U.S. at 520. The Supreme Court has not "set forth an easily administrable test for determining proportionality or identified the factors that a court should consider in assessing congruence," but its precedent

30

indicates that this Court should evaluate "how well-tailored the congressional remedy is to the nature of the right and the history of violations." *Guttman*, 669 F.3d at 1122. When the harms that Congress sought to address are grave and intractable, as here, then Congress may be justified in crafting a powerful remedy. *See Lane*, 541 U.S. at 523-24; *Kimel*, 528 U.S. at 88.

As discussed in depth below, Congress spent over a decade unsuccessfully attempting to stamp out the abuse of people with disabilities in state prisons. By enacting Title II of the ADA, Congress again tried to address that "[d]ifficult and intractable problem[]," *Kimel*, 528 U.S. at 88, by forbidding discrimination against people with disabilities in state prisons and requiring those prisons to reasonably accommodate the needs of inmates with disabilities. "Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this difficult and intractable problem warranted added prophylactic measures in response." *Lane*, 541 U.S. at 531 (internal citations omitted). And Title II is a limited response to that pervasive problem, as it requires only reasonable (not optimal) accommodations for inmates with disabilities and is subject to a variety of other restrictions on inmates' ability to litigate.

31

**1. Before enacting the ADA, Congress spent decades unsuccessfully attempting to address state abuses of inmates with disabilities.**

Congress's pre-ADA efforts to protect the constitutional rights of individuals with disabilities were ineffective. In the early 1970s, prompted by reports of state prison officials denying medical care to and otherwise abusing inmates with disabilities, Congress began to investigate unequal treatment of inmates with disabilities in state facilities. *See, e.g.*, *Corrections, Part VIII, Prisons, Prison Reform, and Prisoners' Rights: Michigan: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 92d Cong. 129-36, 153, 154 (1972). Alarmed by the conditions to which inmates with disabilities were subjected, state and federal courts began to actively "call[] upon the United States Department of Justice to protect institutionalized persons from deplorable conditions in institutions for the mentally disabled, juveniles, and prisoners, among others." H.R. Rep. No. 95-1058, at 7 (1978).

Congress held a series of hearings focused specifically on the mistreatment of institutionalized people with disabilities. The hearings revealed widespread abuses. One prison denied a paralyzed inmate any means of washing himself, another forced a suicidal inmate to remain in unsafe conditions that led to his suicide, and another refused to provide a medically appropriate diet for inmates with diabetes. *Corrections, Part VIII, Prisons, Prison Reform, and Prisoners' Rights: Michigan: Hearings Before*

32

*Subcomm. No. 3 of the H. Comm. on the Judiciary*, 92d Cong. 136, 153, 154 (1972). These early hearings revealed an unmistakable and appalling pattern of widespread neglect of the physical and psychiatric needs of inmates with disabilities. *Id.* at 159-60. When one paralyzed inmate was unable to access even a sink, a guard told him the jail was "not a hotel." *Id.* at 154. When another injured his head because of severe and repeated epileptic seizures, prison officials returned him again and again to the same conditions where he injured his head in repeated falls. *Id.*

Motivated in part by this alarming evidence, in 1973, Congress passed the Rehabilitation Act to secure the civil rights of institutionalized people with disabilities. That Act, which includes language that would later become part of the ADA, provided that no person with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Behind that straightforward language was Congress's overarching goal: "giv[ing] the institutionalized person a sense of being able to affect the environment in which he is confined and the rules and regulations in his day-to-day existence." S. Rep. No. 92-1135, at 25 (1972).

In 1980, nearly a decade of congressional investigation culminated in the passage of another important law: the Civil Rights of Institutionalized

Persons Act (CRIPA). *See* 42 U.S.C. § 1997. The CRIPA hearings had revealed even more extensive patterns of state abuse and indifference to institutionalized people with disabilities. In all, House and Senate Committees produced thousands of pages of reports and transcripts from days of testimony about the mistreatment of institutionalized people with disabilities. *See, e.g.*, *Civil Rights for Institutionalized Persons: Hearings Before the Subcomm. on Cts., C.L., & the Admin. of Just. of the H. Comm. on the Judiciary*, 95th Cong. (1977); *Civil Rights of Institutionalized Persons: Hearings on S. 1393 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 95th Cong. 639, 1066-67 (1978).

The hearings revealed that prisons and other institutions were not just indifferent to inmates with disabilities' constitutional rights but were often themselves the perpetrators of abuse against inmates with disabilities. One Senate committee heard testimony about an inmate with a wheelchair locked in a cell for years, unable to move. *Civil Rights of Institutionalized Persons: Hearings on S. 1393 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 95th Cong. 639 (1978). That committee also heard about a paralyzed inmate whose bedsores grew infected with maggots when the prison did not clean or move him. *Id.* at 1067. In response, CRIPA was enacted "to secure for thousands of institutionalized persons in this country the full guarantees of the U.S. Constitution and Federal laws that are

designed to govern and protect all of us." *Civil Rights of Institutionalized Persons: Hearing on S. 1393 Before the S. Subcomm. on the Const. of the S. Comm. on the Judiciary*, 95th Cong. 1 (1977) (statement of Sen. Birch Bayh, Chairman, S. Subcomm. on the Const.).

But CRIPA proved insufficient to protect the constitutional rights of inmates with disabilities. After CRIPA's passage, the U.S. Commission on Civil Rights issued a report detailing persistent, widespread violations of the constitutional rights of institutionalized individuals with disabilities, including the "[i]mproper handling and communication with handicapped persons by law enforcement personnel," "inadequate treatment … programs in penal and juvenile facilities," and an "inadequate ability to deal with physically handicapped accused persons and convicts," including a lack of basic facilities like accessible cells and toilets. U.S. Comm'n on C.R., *Accommodating the Spectrum of Individual Abilities* 168 (1983); *see also Lane*, 541 U.S. at 527.

CRIPA authorizes the Attorney General to investigate a facility suspected of violating CRIPA and sue the state if that investigation reveals actual violations. *See* 42 U.S.C. § 1997a, 1997b(a)(2). But CRIPA's enforcement framework has proved more of a last resort tangled in red tape than an actual means for guaranteeing individual rights. CRIPA, after all, "only allows DOJ to take action to remedy systemic problems." Office of Juvenile Justice and

35

Delinquency Prevention, U.S. Dep't of Justice, Beyond the Walls: Improving Conditions of Confinement for Youth in Custody (1998).[1] And most importantly, CRIPA did not create any new substantive rights for individuals with disabilities: The legislation did "not create a whole new panoply of rights for [the institutionalized]. It create[d] no rights for anyone." *Civil Rights of Institutionalized Persons: Hearings on H.R. 10 Before the Subcomm. on Cts., C.L., & the Admin. of Just. of the H. Comm. on the Judiciary*, 96th Cong. 4 (1979) (statement of Rep. Tom Railsback). By passing the ADA, as discussed below, Congress took a more forceful approach to protecting prisoners with disabilities from abuse, neglect, and mistreatment.

## 2. The ADA addressed the persistent abuse of individuals with disabilities in state prisons that prior legislation failed to remedy.

The ADA grew in part from the shortcomings of CRIPA and broadened the protections in the Rehabilitation Act. The ADA created guarantees to people with disabilities to be free from both discrimination and the right to reasonable accommodations from public entities, and backed those basic guarantees by creating a private right of action to sue public entities that violate those protections.

---

[1]    https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/pubs/walls/sect-01.html

In crafting the ADA's more forceful approach, Congress compiled an immense record documenting the continuing need to address discrimination against inmates with disabilities. The materials before Congress led it to identify "institutionalization" as a "critical area[]" in which "discrimination against individuals with disabilities persists." 42 U.S.C. § 12101(a)(3).

When considering the ADA, Congress held thirteen hearings that included testimony from expert witnesses and individuals with disabilities about the mistreatment of people with disabilities in the penal system. *See Garrett*, 531 U.S. at 389-90 (Appendix A to opinion of Breyer, J., dissenting) (collecting congressional hearings). Individuals were "deprived of medications while in jail, resulting in further seizures," H.R. Rep. No. 101-485, pt. 3, at 490 (1990), and adults with traumatic brain injuries were jailed because of "aberrant behavior," *Oversight Hearing on H.R. 4498, Americans with Disabilities Act of 1988: Before Subcomm. on Select Educ. of the H. Comm. on Educ. and Labor*, 100th Cong. 1080 (1988) (statement of Ilona Durkin). A service provider to individuals with hearing impairments testified that the provider had "clients who have been arrested and held in jail over night without ever knowing their rights nor what they are being held for." *Joint Hearing on H.R. 2273, The Americans with Disabilities Act of 1989: Before Subcomm. on Select Educ. and Emp. Opps. of the H. Comm. on Educ. and Labor*,

37

101st Cong. 1331 (1989) (testimony of Justin Dart, chairperson of the Task Force on the Rights and Empowerment of Americans with Disabilities).

Congress also created the Congressional Task Force on the Rights and Empowerment of Americans with Disabilities to produce reports and hold forums, which revealed "hundreds of instances of adverse treatment at the hands of state officials" which "Congress could have reasonably believed … represented signs of a widespread problem of unconstitutional discrimination." *Garrett*, 531 U.S. at 379 (Breyer, J., dissenting). Some examples submitted to Congress included state officials arresting and holding Deaf individuals overnight in jail without providing interpreters; a jail's failure to provide medical treatment to a person with a disability; state prisons, among other public institutions, lacking telecommunication devices for the Deaf; and inmates with developmental disabilities being subjected to longer terms and abuse by other inmates. *Garrett*, 531 U.S. at 391-424 (Appendix C to opinion of Breyer, J., dissenting).

In its deliberations on the ADA, Congress also considered the same 1983 U.S. Civil Rights Commission report that had identified persistent abuse of inmates with disabilities after CRIPA's enactment, as well as reports by other bodies. U.S. Comm'n on C.R., Accommodating the Spectrum of Individual Abilities 168 (1983); *see* S. Rep. No. 101-116, at 6 (1989); H.R. Rep. No 101-485, at 28 (1990).

38

The voluminous reports, testimony, and other evidence presented to Congress in its ADA deliberations were clear and overwhelming in their conclusions: State agencies routinely violated the constitutional rights of inmates with disabilities, and those violations were not adequately addressed by existing legislation. The ADA, then, was Congress's effort to comprehensively address persistent disability discrimination in all areas of life, including in prison administration.

### 3. Pre-ADA court decisions contained myriad examples of prisons violating the constitutional rights of inmates with disabilities.

In addition to the voluminous legislative history before Congress, court decisions predating the ADA's passage "document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system." *Lane*, 541 U.S. at 525. Congress is presumed to be familiar with federal precedents and to have considered them when drafting related legislation. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176 (2005). These decisions dealt with countless failures to accommodate the needs of inmates with disabilities as well as prisons' frequent neglect and abuse of vulnerable prisoners. We recount only a fraction of them here.[2]

---

[2] For an extensive recounting of relevant cases, see Brief for the United States as Petitioner at 1a-27a, *United States v. Georgia*, 546 U.S. 151 (2006) (No. 04-1203).

Prisons across the country often failed to accommodate the basic needs of prisoners with disabilities. One prison put an inmate in a cell with a toilet that could not accommodate his paraplegia. *LaFaut v. Smith*, 834 F.2d 389, 392 (4th Cir. 1987). The inmate had to "lie on the floor, drag his body across it, and then pull himself up onto the commode," but "due to the size of the toilet seat, the absence of a railing, and his atrophied leg muscles and narrowed buttocks, he would slip down into the toilet bowl water." *Id.* He was forced to live in these conditions for two months before any attempt was made to accommodate him, and he was not given an appropriate cell until after he contracted a kidney infection. *Id.* at 392-93.

*Ramos v. Lamm*, 639 F.2d 559, 577-78 (10th Cir. 1980), upheld a district court's finding that a prison's mental-health staff was unconstitutionally "grossly inadequate" when it provided only one psychiatrist who visited the prison once every two months and the prison's other mental-health staff were "overworked, undertrained, and underqualified." And in *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980), a prisoner bedridden by a back injury alleged that prison staff failed to provide him a wheelchair, forcing him to drag himself along the floor.

Prisons also neglected inmates with disabilities who required assistance, even in the face of extreme medical need. In *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1243 (6th Cir. 1989), this Court considered the plight of an inmate

40

with paraplegia facing "deplorable" treatment. He was not bathed for several days despite the danger of a recurring ulcer, was forced to lie in his own urine due to a lack of catheters, and received insufficient aid for his bowel training needs. *Id.* He left jail with sores on his ankles and buttocks. *Id.*

Another prison failed to provide medication to an epileptic inmate. *Miranda v. Munoz*, 770 F.2d 255, 257-59 (1st Cir. 1985). After repeated seizures and no serious response from prison staff, the inmate died. *Id.* at 259. And, in *Maclin v. Freake*, 650 F.2d 885, 889 (7th Cir. 1981), a paraplegic inmate alleged that he had not received physical therapy for nearly a year after entering prison.

Most egregiously, some prisons deliberately abused inmates with disabilities. In *Parrish v. Johnson*, 800 F.2d 600, 602-03 (6th Cir. 1986), this Court detailed a prison guard's cruelty toward two paraplegic inmates. The inmates had diminished control over their bladders and bowels and required assistance when they soiled themselves. *Id.* at 602. But the guard "habitually refus[ed] to relay or procrastinat[ed] in transmitting Parrish's requests for aid to the nurses," forcing the inmates to sit in their own waste for significant periods of time. *Id.* at 602-03. Worse, he repeatedly brandished a knife in front of the inmates, extorted food from them, placed meals out of their reach, opened and read their private mail, and verbally abused them,

41

at one point calling an inmate a "'crippled bastard' who should be dead." *Id.* at 603.

Similarly, prison officials transferred a mentally ill inmate into an overcrowded jail with "chaotic and violent" conditions. *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558-60 (1st Cir. 1988) (Breyer, J.). Within months, the inmate was murdered. *Id.* at 560. Another mentally ill inmate was placed in a cell without windows, interior lights, a bunk, floor covering, or a toilet except for a hole in the concrete floor, without clothing or bedding, for fifty-six days. *Littlefield v. Deland*, 641 F.2d 729, 730 (10th Cir. 1981).

\* \* \*

In sum, Congress passed the ADA after years of incremental and inadequate steps to address the entrenched abuse and neglect of prisoners with disabilities, "against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Lane*, 541 U.S. at 524. The ADA thus responded to this country's "history of unfair and often grotesque mistreatment" of institutionalized people with disabilities. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 438 (1985) (quotation marks omitted). "Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this difficult

and intractable proble[m] warranted added prophylactic measures in response." *Lane*, 541 U.S. at 531 (quotation marks omitted).

### 4. Title II is well-tailored to the history of constitutional violations inflicted on inmates with disabilities.

In light of the well-documented history of states' unconstitutional behavior towards inmates with disabilities, Title II was a reasonable and proportional response. *See Lane*, 541 U.S. at 533. Title II's requirements are modest in comparison to the immense, intractable problem of unconstitutional discrimination against inmates with disabilities that Congress set out to remedy.

For starters, Title II's protections extend only to inmates that meet the definition of a "qualified individual with a disability": Inmates must show that they are "disabled" as defined by the ADA and that they are "qualified" to take part in "services, programs, or activities" provided by a public entity. 42 U.S.C. § 12132; *cf. Lane*, 541 U.S. at 531-32. Moreover, they must prove that the discrimination was "*by reason of*" the disability. 42 U.S.C. § 12132 (emphasis added). That causation requirement means that, when a prisoner with a disability suffers harm that is unrelated to his disability, Title II does not provide relief.

Similarly, Title II does not require prisons to wholly restructure the programs they offer inmates. A public entity is obligated to accommodate

43

an individual's disability only when the accommodation does not "impose an undue financial or administrative burden … or effect a fundamental alteration in the nature of the service." *Lane*, 541 U.S. at 532 (citing 28 C.F.R. §§ 35.150(a)(2), (a)(3)). The reasonableness standard is sensitive to the needs of the prison, and the law does not require a prison to offer any particular service. Rather, Title II mandates only that, once a prison decides to provide its inmates with access to a service, program, or activity, it must be "readily accessible to and usable by individuals with disabilities" "when viewed in its entirety." 28 C.F.R. § 35.150(a). In sum, by its own terms, Title II regulates only a circumscribed set of government actions.

Moreover, the Prison Litigation Reform Act of 1995 imposes additional limits on incarcerated litigants' access to courts. Inmates must first exhaust administrative remedies before filing suit. *See* 42 U.S.C. § 1997e(a). The statute requires the dismissal of frivolous claims, 28 U.S.C. § 1915(e)(2)(B)(i), and if an inmate brings three federal suits that are dismissed as frivolous, malicious, or for failure to state a claim, the inmate generally may not file further actions in forma pauperis. 28 U.S.C. § 1915(g). The PLRA also erects barriers to the regulation of prison conditions. *See* 18 U.S.C. § 3626. A court may not grant relief in an action involving prison conditions unless the relief is "narrowly drawn" and is the "least intrusive means" required to correct the violation for a specific plaintiff. *Id*. § 3626(a)(1)(A). Courts are also

44

required to give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system" that would result from the requested relief. *Id.* These provisions give states significant control over prison conditions and allow court intervention under Title II (or any other statute or constitutional provision) only in specified circumstances.

Title II's limited impositions on state prison administration are thus an appropriate, modest response to the intractable problem of unconstitutional discrimination against incarcerated people with disabilities. Congress's abrogation of the Department's Eleventh Amendment immunity is valid, and Mr. Creech's claim should go forward.

## CONCLUSION

This Court should reverse the district court's judgment and remand for further proceedings on the merits.

Respectfully submitted,

                                         /s/ Hannah Mullen

Oren Nimni                          Hannah Mullen

Samuel Weiss                  Brian Wolfman

RIGHTS BEHIND BARS      Madeline Meth

416 Florida Ave., NW #26152   GEORGETOWN LAW

Washington, D.C. 20001       APPELLATE COURTS

                                IMMERSION CLINIC

Kyle Deakins                 600 New Jersey Ave.,

Wynne Leahy                NW, Suite 312

Pegah Nabili                 Washington, D.C.

  Student Counsel           20001

                                (202) 661-6582

Counsel for Plaintiff-Appellant

December 10, 2021

## CERTIFICATE OF COMPLIANCE

This document complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(i)'s type-volume limitation because it contains 10,030 words, excluding parts of the brief exempted by Rule 32(f).

The brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionally spaced typeface using Palatino Linotype, 14-point, in Microsoft Word.

December 10, 2021                                  /s/ Hannah Mullen

                                                   Hannah Mullen

## DESIGNATION OF RELEVANT DOCUMENTS

Under Sixth Circuit Rules 28(b) and 30(g), Appellants designate the following filings in the record as entries that are relevant to this appeal:

| Description of entry | Docket No. | PageID |
|---|---|---|
| Complaint | RE 2 | 35-42 |
| Answer | RE 11 | 78-82 |
| Amended Complaint | RE 17 | 94-110 |
| Order | RE 18 | 111 |
| Plaintiff's Motion for Summary Judgment | | |
| Mot. for Summ. J. | RE 65 | 303-410 |
| Creech Deposition | RE 66 | 411-781 |
| Def's Opp. and Cross-Mot. for Summ. J. | RE 73 | 801-883 |
| Pltf's Reply to Def's Opp. and Response to Cross-Mot. | RE 80 | 979-989 |

Def's Reply to Pltf's Response                  RE 81            990-1003

Reports and Recommendations

  Magistrate Judge's Rep. and Recs.          RE 82            1004-1020

  Pltf's Obj. to Rep. and Recs.               RE 85            1032-1044

  D. Ct's Recommittal Order                   RE 86            1045-1046

  Magistrate Judge's Supp. Rep. and Recs.     RE 88            1061-1067

  Pltf's Obj. to Supp. Rep. and Recs.         RE 91            1071-1118

Orders and opinions

  Summ. J. Opinion and Order                  RE 94            1122-1126

  Entry of Judgment                           RE 95            1127

Notice of Appeal

  Notice of Appeal                            RE 98            1133-1142

## CERTIFICATE OF SERVICE

I certify that on December 10, 2021, I filed this brief with the Clerk of the Court electronically via the CM/ECF system. All participants in this case are registered CM/ECF users and will be served electronically via that system.

December 10, 2021                                    /s/ Hannah Mullen

                                                     Hannah Mullen